Danny J. QUIMBY, Respondent,

v.

STATE of Minnesota, DEPARTMENT
OF PUBLIC SAFETY,
Petitioner, Appellant,

and

Danny J. QUIMBY, Petitioner,
Appellant,

v.

STATE of Minnesota, DEPARTMENT
OF PUBLIC SAFETY, Respondent.

Nos. C2–83–1021, C6–83–1068.

Supreme Court of Minnesota.

July 13, 1984.

Hubert H. Humphrey, III, Atty. Gen., Linda F. Close, James B. Early, Sp. Asst. Attys. Gen., St. Paul, for appellant.

Mark G. Stephenson, Rochester, for respondent.

WAHL, Justice.

These consolidated appeals question the adequacy of the training standards promulgated by the Commissioner of Public Safety for persons administering blood and breath tests and the approval by the Commissioner of training programs for breathalyzer operators as the standards and approval relate to the admissibility of the results of those tests in implied consent hearings. In Case No. C2–83–1021 (Quimby I), the Olmsted County Court rescinded the proposed revocation of Danny Quimby's driver's license, holding that the result of the breathalyzer test given to Quimby was inadmissible. The court determined that there was insufficient foundation to admit the test results because it found a lack of objective training standards for breathalyzer operators. A three-judge panel of the Third Judicial District affirmed in a 2–1 decision on the ground that the breathalyzer operator's qualifications were invalid either because the operator's training was not qualified for the Commissioner's required approval or because the Commissioner had not properly approved the training program. The Department of Public Safety (DPS) petitioned this court for permission to appeal. We reverse.

In Case No. C6–83–1068 (*Quimby II*), the Olmsted County Court sustained the revocation of Quimby's driver's license due to a second arrest for a separate incident of driving while under the influence of alcohol. The court held that there was probable cause for Quimby's arrest and that the result of the blood test given him after his arrest was admissible at the implied consent hearing despite Quimby's contention of lack of foundation due to the lack of training standards for persons drawing blood samples. A three-judge panel of the Third Judicial District affirmed in a 2–1 decision. We granted permission to appeal and affirm the decision of the appeal panel.

QUIMBY I

Quimby was arrested on March 14, 1982, for DWI. He agreed to take a breathalyzer test. Olmsted County Deputy Sheriff Burton Berger administered the test. The test showed that Quimby had .17% alcohol concentration. He was given notice of the proposed revocation of his driver's license under Minn.Stat. § 169.123, subd. 4 (1982).

Quimby does not argue that the test itself was inaccurate or that Deputy Berger failed to administer it properly. His argument, which was accepted by the county court, is that the test result is inadmissible because the Commissioner failed to adequately comply with a statutory requirement to promulgate training standards for breathalyzer operators. Quimby's second argument is that the Commissioner never approved the training program undergone by Deputy Berger as required by rule.

*1. Training Standards for Persons Administering Breath Tests.*

Minnesota Statutes § 169.123, subd. 3 (1982), which was in effect at the time of

the events in this case, required that persons administering tests for alcohol concentration be "fully trained in the administration of the tests pursuant to standards promulgated by rule of the commissioner of public safety." The Commissioner did promulgate a set of rules entitled, Standards of Training for Persons Administering and Interpreting Chemical Tests for Intoxication, 11 MCAR §§ 1.0096–1.013 (1982). Rule 1.0099 provides:

Persons who administer breath tests. Any person, who has satisfactorily completed a course of formal classroom instruction in the use of an instrument specially manufactured to analyze a specimen of breath to determine the alcoholic content of the blood, may administer a breath test at the direction of a peace officer. The course of instruction must be approved by the Commissioner. After completion of the described course such person may be required to periodically demonstrate to the Commissioner or his duly authorized and acting agents, his competence to satisfactorily operate such instrument.

Quimby, questioning neither the adequacy of Deputy Berger's training or the accuracy of the test results, argues rather that the rule does not set sufficiently specific standards for training. The statute, however, gives broad discretion to the Commissioner in setting standards.

The county court concluded that there should be performance standards or specific training standards, as in DPS Rules Saf Ad 106–108 (1982), the rules governing training of law enforcement officers. In the case of law enforcement, training is provided by a number of institutions with no connection to the DPS, and specific training standards are necessary to ensure uniform and adequate training. In this case, Deputy Berger was originally certified as a breathalyzer operator by the Minnesota Bureau of Criminal Apprehension (BCA) in 1970 after taking a 40-hour training course. He has been recertified every 1 or 2 years since then after taking refresher courses and successfully passing exams. The training received by Deputy Berger was provided by the BCA, which is part of the DPS and directly under the control of the Commissioner. We see no need for more specific standards where the training is provided, not by institutions having no connection with the DPS but directly by the Commissioner. We hold that the training standard for breathalyzer operators promulgated by the Commissioner, within the broad discretion accorded by section 169.123, subd. 3, accomplishes the purpose of the statute and does not preclude admission of breathalyzer test results in implied consent hearings.

*2. Commissioner Approval of Course of Instruction for Breathalyzer Operators.*

Rule 1.0099 requires that the Commissioner approve the course of instruction given to breathalyzer operators. There is no written approval, signed by the Commissioner, of the training program undergone by Deputy Berger. Quimby argues that the lack of explicit approval for this specific program makes the test result inadmissible. We do not agree. Not only was the training program administered under the control of the Commissioner, certification of breathalyzer operators was actually part of the function of the Commissioner's department. Even if the rule required written approval of the department's own training program, the individual certification of each operator is sufficient for inferring Commissioner approval of that program. We hold that the lack of explicit approval of the breathalyzer training program undergone by Deputy Berger does not make the result of Quimby's breath test inadmissible at the implied consent hearing.

The overall aim of the statute and rule for administering breath tests is to ensure that breath test instrument operators are trained to accurately operate the instruments so that evidence of intoxication sufficient to require revocation of drivers' licenses is reliable. There is no argument here that the test result was inaccurate or that Deputy Berger was not properly

trained. So long as the test is accurately administered, this court recognizes the validity of the analysis performed by the breathalyzer. *State, City of St. Louis Park v. Quinn*, 289 Minn. 184, 182 N.W.2d 843 (1971). Quimby's final argument, that the test result is inadmissible because there are no training standards for persons interpreting breathalyzer results, is answered by the fact that no one needs to interpret the test results. The machine makes the interpretation. The county court improperly excluded the result of the breath test in this case.

QUIMBY II

On November 21, 1982, Quimby was again arrested for DWI. He was arrested in Stewartville by Olmsted County Deputy Sheriff Joe Loftus. Deputy Loftus observed a black Oldsmobile driving, in Loftus' opinion, dangerously fast. He observed the Oldsmobile screech and slide around two corners. By the time he caught up with the car, it was parked and both the driver and the passenger were already out of it and walking toward the door of a cafe. Deputy Loftus testified that upon seeing Quimby he recognized him as the driver of the car and called him over, observing alcohol on his breath, thick speech, flushed face, bloodshot eyes and a swaying walk. After the arrest, Quimby agreed to take a blood test. The blood sample was drawn by Dr. Timothy S. Yeh, using a BCA blood test kit, and was sent to the BCA laboratory for analysis. The result of the blood test showed .17% alcohol concentration. Dr. Yeh is a fully qualified physician with the Mayo Clinic in Rochester, Minnesota. Quimby was given proper notice of the proposed revocation of his license.

At the implied consent hearing, Quimby argued that there was no probable cause for his arrest and that, even if there was, the result of the blood test was inadmissible to show the alcohol concentration in his blood because the Commissioner had failed to promulgate specific training standards for persons authorized by statute to draw

blood. The county court and the three-judge district court appeal panel rejected Quimby's arguments and sustained the revocation of his driver's license.

### 1. Probable Cause for Arrest.

A peace officer may make a warrantless arrest only for an offense committed or attempted in his presence. Minn.Stat. § 629.34, subd. 1 (1982). To have probable cause for a DWI arrest, the officer must "(1) become aware, as a result of his sensory perception, of the act of driving and of the defendant's intoxication; and (2) have a reasonable basis to infer that defendant was in fact driving the vehicle while he was under the influence." *State v. Dax*, 290 Minn. 546, 547, 188 N.W.2d 422, 423 (1971). Quimby argues that his arrest was without probable cause. Deputy Loftus testified that he saw Quimby driving a car too fast around two corners. Once he caught up with the car, Quimby was no longer in it, but he recognized Quimby as the driver of the car. Deputy Loftus concluded that Quimby was intoxicated after conversing with him and watching his behavior and arrested him for DWI.

Quimby testified that he was driving the car but that it was too dark on that particular corner for the deputy to have recognized him while he was driving. He said he was going slower than 30 m.p.h., the speed limit on that street, and that he never later told Deputy Loftus that he was driving. Quimby's passenger testified similarly.

■ The county court had difficulty believing the car hit speeds of 50 m.p.h., as Deputy Loftus had testified, but had more trouble believing Quimby's testimony. The court found that the deputy had probable cause to believe Quimby was driving the car and that the subsequent arrest was valid. The decision was clearly based on the court's finding that Loftus' testimony was more credible than Quimby's. Two of the three judges on the appeal panel agreed that the arrest was valid and that the lower court's finding's of fact were sufficient to meet the requirement of Minn. R.Civ.P. 52.01. Rule 52.01 provides that

the findings made by the trial court "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." We hold that the appeal panel properly concluded, on the record before it, that the lower court's finding of probable cause for the arrest was not clearly erroneous.

### 2. Training Standards for Persons Drawing Blood Samples.

Both the county court and the district court appeal panel rejected Quimby's argument that the lack of a rule specifying training standards for persons drawing blood samples to test for alcohol concentration precludes using the result of the blood test as evidence of intoxication.

 Before it was amended in 1983, Minn.Stat. § 169.123, subd. 3 (1982), in relevant part, read:

> Only a physician, medical technician, physician's trained mobile intensive care paramedic, registered nurse, medical technologist or laboratory assistant acting at the request of a peace officer may withdraw blood for the purpose of determining the presence of alcohol or controlled substance. This limitation does not apply to the taking of a breath or urine specimine. * * * The person administering a test at the request and direction of a peace officer shall be fully trained in the administration of the tests pursuant to standards promulgated by rule of the commissioner of public safety.

As with breath test administrators, the Commissioner is given broad discretion in setting training standards for persons drawing blood. The rule promulgated by the Commissioner regarding training standards for persons drawing blood simply repeats the list of persons named in the statute as those authorized to draw blood. Rule 1.0098. Those persons do not analyze the blood samples; they simply draw the blood, using a BCA blood sample kit. We find nothing in the statute or underlying statutory purpose to preclude the Commissioner from determining that the formal training received by the persons listed is sufficient to allow them to draw blood in this context. We hold that the training standards for those authorized to draw blood samples for later analysis for alcohol concentration promulgated by the Commissioner of Public Safety are sufficient to meet the statutory requirement. There is nothing in the record to preclude the use of Quimby's blood test result to revoke his driver's license under section 169.123, subd. 4.

We reverse the order of the district court appeal panel in Quimby I. We affirm the order of the district court appeal panel in Quimby II.

Quimby I reversed; Quimby II affirmed.